FILED

2020 May-12  PM 03:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

WALKER T. PHILLIPS, Individually and    )
on Behalf of All Others Similarly Situated,    )
                               )
         Plaintiff,               )
                               )
v.                                    )      Case No. 2:19-cv-01727-JEO
                               )
GARRISON PROPERTY & CASUALTY,    )
et al.,                                )
                               )
         Defendants.         )

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Walker T. Phillips filed this putative class action in the Circuit Court of Jefferson County, Alabama, asserting state-law claims for breach of contract, the tort of bad faith, tortious interference with contractual relations, and conspiracy against Defendants Garrison Property & Casualty Insurance Company ("Garrison") and CCC Information Services, Inc. ("CCC") (collectively "Defendants"). (Doc.[1] 1-2 at 8-34 ("Complaint" or "Compl.")). Invoking the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), Garrison removed the action to this court. (Doc. 1 ("Notice of Removal" or "NOR")). Defendants have

---

[1] References to "Doc(s). ___" are to the document number(s) of the pleadings, motions, and other materials in the court file, as compiled and designated on the docket sheet by the clerk of the court. Citations to the Complaint to the paragraph(s) thereof, except where otherwise noted. Other pinpoint citations are to the page of the electronically filed document on the court's CM/ECF system, which may not correspond to pagination on the "hard copy" of the document presented for filing.

now filed respective motions to compel Plaintiff to submit his motor vehicle to a value appraisal under the terms of his insurance policy and to stay or dismiss the action. (Docs. 20 & 21). In addition, CCC previously filed a motion to stay all discovery pending the completion of any appraisal the court might order, which was granted. (Docs. 22 & 23). Upon reviewing the motions and the parties' supporting submissions (*see* Docs. 20, 21, 39, 40, 44, 45, 50), the court[2] discerned a threshold question of whether it has subject-matter jurisdiction. Having satisfied itself that jurisdiction does indeed exist, the court will (1) grant Garrison's motion to compel an appraisal as it relates to the claims against it and (2) deny CCC's motion to compel same. Upon completion of the appraisal ordered herein, the parties are to meet and confer to provide the court with dates concerning discovery and dispositive motions.

## I.    Background

The salient allegations of the Complaint are these: Plaintiff, an Alabama citizen, was the owner of a 2013 Jeep Grand Cherokee Limited motor vehicle. (Compl. ¶ 14). Plaintiff had insurance with Defendant Garrison covering damage to his vehicle. (Id. ¶ 15; *see also* Doc. 1-2 at 36-89). After his vehicle was

---

[2] The action was originally assigned to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b); Rule 72, Fed. R. Civ. P.; and the court's general order of reference dated January 2, 2015. The parties have since consented to an exercise of plenary jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c) and Rule 73, Fed. R. Civ. P. (Doc. 32).

involved in an accident on May 19, 2019, Garrison declared it a total loss. (Compl. ¶ 16). Under the policy, Garrison was obligated in such a circumstance to pay the "actual cash value" of the vehicle (Compl. ¶¶ 18-19), defined as "the amount that it would cost, at the time of loss, to buy a comparable vehicle." (Doc. 1-2 at 70). To determine such "actual cash value," Garrison relies on "Market Valuation Reports" prepared by Defendant CCC, a third party with whom Garrison has contracted. Plaintiff received two such CCC reports on his vehicle. (Compl. ¶¶ 20-24). The first, dated May 23, 2019, listed a "Total" value of $17,280.33 (Doc. 1-2 at 91-133), while the second, dated May 31, 2019, listed a "Total" value of $18,163.34. (*Id.* at 116-133). Plaintiff insists, however, that both CCC reports materially undervalued his vehicle and that, as a result, Garrison failed to pay him its actual cash value as required by the policy. (Compl. ¶ 25).

At the heart of Plaintiff's claims lies an allegation that Garrison and CCC conspired to facilitate Garrison's systemic failure to pay actual cash value for total-loss vehicles of Garrison's Alabama insureds like himself. According to Plaintiff, such occurs through Garrison's reliance upon CCC's Market Valuation Reports that Plaintiff says undervalue vehicles through a methodology that Defendants know to be statistically invalid and otherwise unlawful and improper. Plaintiff asserts that this "scheme … invites taking several hundred or a thousand dollars from thousands of individual insureds" (Compl. ¶ 2), resulting in Garrison's having

3

"retained significant funds in the millions of dollars by underpaying Plaintiff and Class Members." (*Id.* ¶ 50). In this vein, Plaintiff broadly suggests that CCC's reports generally value vehicles lower than do "Guidebooks" historically relied upon by auto sellers, lenders, and other insurers, such as NADA and Kelley Blue Book, which Plaintiff posits to be "proper source[s]" for determining actual cash value. (*See* Compl. ¶¶ 59-66, 87, 97).

Plaintiff also attacks CCC's underlying valuation methodology. Under it, CCC first selects a number of so-called "Comparable Vehicles" from a database it maintains, considering characteristics and features of the vehicle of Garrison's insured. CCC then makes certain "adjustments" to the value of such "Comparable Vehicles," including for their "condition." Next, CCC averages the adjusted value of the "Comparable Vehicles," giving a "Base Vehicle Value" for the vehicle of Garrison's insured. To that, CCC makes an adjustment for the pre-loss condition of the insured's vehicle, to arrive at an "Adjusted Vehicle Value." Finally, CCC adds an amount representing a "Vehicular Tax" on the purchase of a replacement vehicle, yielding a "Total" amount to be paid the insured, minus any applicable deductible.

Plaintiff complains that, in this process, CCC selects "Comparable Vehicles" from its database using skewed search criteria that intentionally exclude vehicles more comparable to the vehicle of Garrison's insured in favor of vehicles that are

4

less so and worth less, for reasons such as excessive mileage or damage.  (Id. ¶¶ 36-38).  Plaintiff's principal issue with CCC's method, however, is with its use of negative "Condition Adjustments" to the selected "Comparable Vehicles," which downgrade their value and, in turn, the "Base Vehicle Value" of the insured's vehicle.  (Compl. ¶¶ 40-41).  Plaintiff claims that CCC does not inspect "Comparable Vehicles" and does not otherwise have accurate information on their true condition.  Plaintiff thus casts the "Condition Adjustments" as "wholly arbitrary and … not based on any statistical, objective, valid, or verifiable data" such that they due to be "disregarded" (Id. ¶ 48), giving rise to damages in the amount of any such adjustments.  (See id. ¶¶ 93-95).

Plaintiff indicates he does not know the exact amounts CCC might have deducted in value for "Condition Adjustments" in other cases in which Garrison declared a total loss on a vehicle owned by an Alabama insured, though such amounts are ascertainable, Plaintiff alleges, from an electronic database Garrison maintains.  (Id.).  Plaintiff claims, however, that his own case aptly illustrates CCC's use of illegitimate "Condition Adjustments" to "Comparable Vehicles." Plaintiff highlights that both reports on his vehicle show CCC assigned a downward "Condition Adjustment" of $699.00 to each "Comparable Vehicle" selected from CCC's database.  (Id. ¶¶ 41, 44).  He  maintains, however, that "there is no accurate or statistically valid set of facts under which [CCC's] purported

'process' could result in a downward Condition Adjustment in exactly the same amount … for each of the comparable vehicles." (*Id.* ¶ 44). And "the direct effect of these Comparable Vehicle Condition Adjustments," Plaintiff concludes, "is to reduce the Base Vehicle Value of [his] vehicle by approximately $699.00." (*Id.* ¶ 48).

Based on such allegations, Plaintiff filed this action in the Alabama state court against Garrison and CCC on September 16, 2019. The Complaint divides the cause of action into five counts. All raise claims under Alabama state law on behalf of Plaintiff and a putative class, defined as follows:

> All persons and entities that have made first-party claims since May 9, 2013 under an automobile insurance policy issued within the state of Alabama by Garrison whose vehicles were declared a total loss by Garrison and were valued using CCC's total loss valuation system.

(Compl. ¶ 82). This broader group encompasses two subclasses. The first is a "Condition Adjustment" subclass, consisting of Alabama insureds whose total loss claims were reduced by downward "Condition Adjustments" to the "Comparable Vehicles," the class members total-loss vehicles, or both. (*Id.* ¶ 86). The other is a "Market Value" subclass, comprised of all Alabama insureds whose vehicles received CCC Reports with "Adjusted Values" that were less than Actual Cash Value as established by Guidebooks. (*Id.* ¶ 87). Plaintiff admits he does not know the "exact number" of members in the broader class, but he estimates it to encompass "many thousands of people." (*Id.* ¶ 88).

6

In Count I, Plaintiff claims Garrison is liable for breach of contract, citing Garrison's (a) alleged failure to investigate and confirm the statistical validity of CCC's valuation methodology, (b) improper delegation to CCC of Garrison's obligation to value total loss vehicles, and (c) wrongful failure to properly adjust Plaintiff's loss and pay him the actual cash value of his Vehicle, as required by the policy.  (Compl., Count I, ¶¶ 103-108).  In Count II, Plaintiff claims that CCC is liable for tortious interference with the contractual relations between Garrison and its policyholders, including Plaintiff.  (*Id.*, Count II, ¶¶ 109-117).  CCC did so, Plaintiff says, "by knowingly and intentionally providing Garrison with a statistically invalid and wholly arbitrary total loss valuation for the specific purpose of enabling Garrison to underpay the claims of total loss insured, including Plaintiff's claim."  (*Id.* ¶ 114).  In Count III, Plaintiff asserts a claim for breach of contract against CCC, on the theory that Plaintiff and other class members are third-party beneficiaries of the contract by which Garrison enlists CCC to provide total loss valuations on policy claims.  (*Id.*, Count III, ¶¶ 118-123).  Count IV asserts that Garrison is liable for the tort of bad faith, claiming it utilized CCC's reports knowing that their valuation methodology consistently undervalued total-loss vehicles of Garrison's insureds  (*Id.*, Count IV, ¶¶ 124-133).  Finally, Plaintiff claims in Count V that both Garrison and CCC are liable for the tort of civil conspiracy under Alabama law, alleging they "entered into an illicit agreement and

conspiracy" to utilize CCC Valuations to provide improper total loss valuations. (Compl., Count V, ¶¶ 134-139).  On his claims, Plaintiff demands relief on behalf of himself and all class members, including unspecified amounts of compensatory damages, punitive damages, attorneys' fees, as well as an injunction prohibiting Garrison from using CCC valuations with respect to insureds in Alabama.  (*See id.*, "Prayer for Relief following ¶ 139).

On October 22, 2019, Garrison removed the action, *see* 28 U.S.C. §§ 1441, 1446, founding subject-matter jurisdiction on CAFA.  On November 19, 2019, each Defendant filed a motion to compel an appraisal of the Plaintiff's vehicle and to stay or dismiss this action, based on provisions of the policy.  (Docs. 20, 21). Plaintiff has opposed both motions (Docs. 39, 40), and Defendants have replied. (Docs. 44, 45, 50).  CCC has also filed a motion to stay discovery should the court grant any motion to compel and appraisal.  (Doc. 22).

## II.   Jurisdiction

Before considering the motions to dismiss, however, the court deems it appropriate to address subject-matter jurisdiction.  No party questions that this court does, in fact, have such jurisdiction.  However, federal courts are courts of limited jurisdiction, authorized to hear only those types of cases prescribed by Congress.  *Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1345 (11th Cir. 1997).  As such, they "have an independent obligation to ensure that they do

8

not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)).  If the court were to determine that jurisdiction is lacking, it would have to remand the action to state court  *See* 28 U.S.C. § 1447(c).  And as further explained below, Garrison's Notice of Removal left the court with some question as to whether jurisdiction is present.

Garrison removed the action based on CAFA, which grants federal district courts jurisdiction over class actions where (1) any member of the plaintiff class is a citizen of a state different from the state of citizenship of any defendant, (2) the proposed plaintiff class contains at least 100 members, and (3) the aggregate amount in controversy exceeds $5 million.[3]  *See* 28 U.S.C. § 1332(d)(2)(A),

---

[3] No party suggests that the court might have jurisdiction other than under CAFA, and the court agrees.  In cases that, as here, do not involve a federal agency or official, there are two primary statutory grants of federal jurisdiction, colloquially known as "federal-question jurisdiction" under 28 U.S.C. § 1331 and "diversity jurisdiction" under 28 U.S.C. § 1332(a).  *See Home Depot U. S. A., Inc. v. Jackson*, ___ U.S. ___, ___, 139 S. Ct. 1743, 1746 (2019).  The former requires that the plaintiff's complaint asserts a claim for relief arising under the Constitution, laws, or treaties of the United States.  Plaintiff, however, presses only state-law claims.  Diversity jurisdiction, on the other hand, requires that no plaintiff shares citizenship with any defendant and that the amount in controversy exceeds $75,000.  Even assuming there is complete diversity, the Complaint does not allege physical injury and claims that the economic loss suffered by Plaintiff and members of the class is between only a few hundred and perhaps a thousand dollars each.  (*See* Compl. ¶¶ 2, 46).  As such, it does not appear that Plaintiff's own claim, or the claim of any other individual class member, puts $75,000 in controversy, and amounts put at issue by individual claims of class members may not be aggregated to reach that sum under § 1332(a).  *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005); *Leonard v. Enterprise Rent a Car*, 279 F.3d 974 (11th Cir. 2002).

(5)(B), (6); *Anderson v. Wilco Life Ins. Co.*, 943 F.3d 917, 923 (11th Cir. 2019).

Because Garrison removed the action, it bears the burden to plead and, if

necessary, prove these elements.  *See Spencer v. Specialty Foundry Prod. Inc.*, No.

19-14427, ___ F.3d ___, ___ n. 4, 2020 WL 1270276, at *3 n. 4 (11th Cir. Mar.

17, 2020) (citing *Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1208 (11th Cir.

2007)).  Unlike in ordinary cases, there is no presumption against removal in

CAFA cases.  *Anderson*, 943 F.3d at 925 (citing *Dart Cherokee Basin Operating

Co., LLC v. Owens*, 574 U.S. 81, 89 (2014)).

 The first two CAFA requirements are certainly met.  That is, the parties

agree that Plaintiff is a citizen of Alabama and that Garrison is a Texas corporation

with its principal place of business in that same state, making it a citizen of Texas

under 28 U.S.C. § 1332(c)(1). (Compl. ¶¶ 7, 9; NOR ¶¶ 15, 16).  That establishes

minimal diversity.  It is also sufficiently shown that the putative class would

contain at least 100 members, as both sides agree that it would have some

thousands of members.  (Compl. ¶ 88; NOR ¶ 13).

 It's less obvious from Garrison's Notice of Removal, however, that CAFA's

$5 million aggregate amount-in-controversy element is met.  The Eleventh Circuit

has recently reiterated:

> "A court's analysis of the amount-in-controversy requirement
> focuses on how much is in controversy at the time of removal, not
> later."  *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 751 (11th
> Cir. 2010). Therefore, "the pertinent question is what is in controversy

in the case, not how much the plaintiffs are ultimately likely to recover" as a result of the lawsuit. *Id.* (internal quotation marks omitted); *Dudley* [*v. Eli Lilly & Co.*, 778 F.3d 909, 913 (11th Cir. 2014)], ("The amount in controversy is not proof of the amount the plaintiff will recover. Rather, it is an estimate of the amount that will be put at issue in the course of the litigation." (internal quotation marks omitted)); [*South Fla. Wellness, Inc. v. Allstate Ins. Co.*, 745 F.3d 1312, 1315 (11th Cir. 2014)].

*Anderson*, 943 F.3d at 925.

When a defendant removes an action, "all that is required is a 'short and plain statement of the grounds for removal,' including 'a plausible allegation that the amount in controversy exceeds the jurisdictional threshold.'" *Dudley v. Eli Lilly & Co.*, 778 F.3d 909, 912 (11th Cir. 2014) (quoting 28 U.S.C. § 1446(a) and *Dart Cherokee Basin*, 574 U.S. at 89, respectively). "The removing defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court." *Id.* (quoting *Dart Cherokee Basin*, 547 U.S. at 82). "When the plaintiff contests or the court questions the defendant's allegation, the defendant must prove by a preponderance of the evidence that the amount in controversy is sufficient." *Anderson*, 943 F.3d at 925. "To determine whether the defendant has carried its burden, a court may rely on evidence put forward by the removing defendant, as well as reasonable inferences and deductions drawn from that evidence." *Id.* In the end, "estimating the amount in controversy is not nuclear science; it does not demand decimal-point precision," *South Fla. Wellness, Inc.*, 745 F.3d at 1317, and judges may rely on "their judicial experience and

11

common sense." *Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058, 1061–62 (11th Cir. 2010).

Garrison's Notice alleges that the aggregate amount in controversy exceeds $5 million.  (NOR ¶¶ 20, 29).  In support, Garrison points out that Plaintiff is seeking (1) compensatory damages, (2) punitive damages, (3) attorney's fees, and (4) injunctive relief, and Garrison argues that the value of each category is properly considered as going towards the amount in controversy.  (*See id.* ¶¶ 20-28).  But right out of the gate, the court finds that neither Plaintiff's demand for attorney's fees nor for injunctive relief moves the needle at all on the jurisdictional amount, for reasons explained below.

A potential attorney's fee award may be included in the amount in controversy only when such a fee may be recovered from the defendant under relevant state law.  *Smith v. GTE Corp.*, 236 F.3d 1292, 1305 (11th Cir. 2001). However, Alabama generally follows the "American Rule," whereby each party to litigation is responsible for its own attorney's fees, win or lose, unless a contract or statute provides otherwise, or "special equity" calls for such an award, specifically, where the recovery establishes a "common fund" from which attorney's fees might be paid or the lawsuit bestows a "common benefit" upon the public.  *Leonard v. Enterprise Rent a Car*, 279 F.3d 967, 973-74  (11th Cir. 2002); *Davis v. Carl Cannon Chevrolet-Olds, Inc.*, 182 F.3d 792, 795 (11th Cir. 1999).  No party says

12

that the Garrison insurance policy or the contract between Garrison and CCC

contains a provision that might authorize a policy holder like Plaintiff to recover

attorney's fees for a breach.  Instead, Garrison's sole argument in favor of

considering attorney's fees is based on a suggestion that some statute authorizes

their recovery.  (*See* NOR ¶ 25).  The Complaint, though, raises only common-law

causes of action: breach of contract, the tort of bad faith, tortious interference with

contractual relations, and civil conspiracy.[4]  No party cites, and the court is not

otherwise aware of, an Alabama statute authorizing an award of attorney's fees

against a defendant with respect to any of those claims.  *See Federated Mut. Ins.*

*Co. v. McKinnon Motors, LLC*, 329 F.3d 805, 808 n. 4 (11th Cir. 2003).  That

distinguishes this case from the attorney's fee cases that Garrison cites.[5]

      Garrison also does not contend that potential attorney's fees might be in

controversy based on either the "common fund" or "common benefit" exception to

Alabama's' observance of the American Rule.  But even had Garrison made such

an argument, the court would reject it.  First, it might be assumed that the

---

[4] The court notes that Garrison's Notice alleges that Plaintiff has asserted a claim for "deceptive trade practices" (NOR ¶ 20), but the Complaint includes no such claim.

[5] (*See* NOR ¶ 25 citing *Heyman v. Lincoln Nat'l Life Ins. Co.*, 781 F. App'x 463, 473 (6th Cir. 2019) (attorney's fees properly considered part of the amount in controversy where a Kentucky statue authorized recovery of such fees); *DiPonzio v. Bank of Am. Corp.*, 2011 WL 2693912, at *3 (W.D.N.Y. July 11, 2011) (same, New York statute); and *Evans v. International Paper Co.*, 2011 WL 2559791, at *3-4 (W.D. La. June 28, 2011) (same, citing Louisiana class action statue)).

"common fund" exception might apply in this class action.  However, any attorney's fees awarded under that doctrine would not add to the amount in controversy because they would be assessed not directly against a defendant but instead from out of the substantive damages award otherwise recovered on behalf of the class, which would already be counted as part of the jurisdictional sum.  *See Leonard*, 279 F.3d at 974; *Davis*, 182 F.3d at 796.

The "common benefit" doctrine also plainly does not apply here.  Plaintiff's suit might involve a benefit only to a quite limited, particular group: Garrison insureds making first-party claims on total-loss motor vehicles.  That is not the kind of benefit flowing to the public at large required for attorney's fees under the "common benefit" doctrine as interpreted in Alabama.  *See Davis*, 182 F.3d at 795; *Smith*, 236 F.3d 1307-09; *see also Alabama Alcoholic Beverage Control Bd. v. City of Pelham*, 855 So. 2d 1070, 1084-85 (Ala. 2003).  Accordingly, the court will not consider such potential fees as part of the amount in controversy.

Plaintiff has also demanded declaratory and injunctive relief.  (*See* Compl., "Prayer for Relief" following ¶ 139, ¶¶ E, H).  Garrison is correct that the value of such relief, measured from the plaintiff's perspective, might be considered as part of the amount in controversy.  *See Anderson*, 943 F.3d at 925.  However, "the value of declaratory or injunctive relief must be sufficiently measurable and certain," so "the amount-in-controversy requirement is not satisfied if the value of

14

the injunctive relief to the class plaintiffs is 'too speculative and immeasurable.'"
*Id.* (citations omitted).

The only specific request Plaintiff makes with respect to equitable relief is for an order prohibiting Garrison from using CCC reports in the future to value total-loss vehicles of Garrison's insureds in Alabama.  Garrison's Notice of Removal nods at that request and summarily states that its value is due to be considered in determining the amount in controversy.  (NOR ¶ 26).  Garrison fails, however, to attempt to pin a value on such relief to the class.  Nor can the court reasonably do so, given that it is speculative (1) whether Plaintiff or other members of the class might ever submit another total-loss claim to Garrison in the future, (2) what valuation method Garrison might use to replace CCC reports, (3) what effect such a switch might have on Garrison's total-loss vehicle valuations.  *See Friedman v. New York Life Ins. Co.*, 410 F.3d 1350, 1358 (11th Cir. 2005). Because the court finds the value of the prospective injunctive relief to be wholly speculative, the court cannot consider it in assessing the jurisdictional sum.  *See id.*

Therefore, we are just left to consider Plaintiff's demands for compensatory and punitive damages.  To that end, Garrison's Notice of Removal starts by highlighting that the "aggregate valuation" of its settlements on all first-party, total-loss auto claims with its Alabama insureds during the class period was $22,903,892.33.  (NOR ¶ 21).  However, "as would seem self-evident, when an

insurer makes pre-suit payments towards an insured's claim, such amounts are not 'in controversy' and thus are not included when determining whether the jurisdictional threshold has been met." *Koester v. State Farm Ins. Co.*, 2012 WL 5265783, at *5 (N.D. Ala. Oct. 22, 2012). Rather, what would matter is how much Plaintiff is claiming that that Garrison wrongfully *failed* to pay *beyond* what Garrison actually did pay. *See id.*

Garrison takes a stab at calculating that amount too, estimating potential compensatory damages by extrapolating Plaintiff's own claimed loss of $699 to all members of the class, which Garrison alleges to contain 2,286 members. (*See* NOR ¶ 22). The former is the amount of the purportedly improper downward "Condition Adjustment" on the "Comparable Vehicles" listed on the CCC reports Plaintiff received. The Complaint does not allege, however, that Defendants even made a negative "Condition Adjustment" with respect to "Comparable Vehicles" for every class member's vehicle and certainly not uniformly in the amount of $699. Plaintiff generally avers, rather, that, Garrison has wrongfully retained between "several hundred [and] a thousand dollars from thousands of individual insureds" (Compl. ¶ 2) and that the specific amount of any improper value "Adjustments" and of any total-loss claim settlements below "Guidebook" value for individual class members will be deducible from Garrison's records. (*See id.* ¶¶ 93-99). It therefore appears that Garrison has simply assumed that Plaintiff's

16

own claimed loss of $699 is either the same as, or represents the average of, all other class members. It is doubtful under Eleventh Circuit precedent, however, that Garrison might do so to establish the amount of the class's claimed aggregate economic loss. *See Dudley*, 778 F.3d at 916 (holding that the defendant had failed to support a finding of a sufficient amount in controversy where defendant provided only a ranges of possible amounts of alleged unpaid compensation and then used the "midpoint" of these ranges to calculate the potential total amount in controversy); *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 769 (11th Cir. 2010) (holding that removing defendant could not extrapolate the amount of the loss of named plaintiffs to all absent plaintiffs based just on the complaint's allegation that the named plaintiff's claims were "typical" for purposes of Rule 23); *Signor v. Safeco Ins. Co. of Illinois*, 2019 WL 7911214, at *2 (S.D. Fla. Dec. 11, 2019) ("Simply assuming that Plaintiff's damages [arising from an improper valuation of his total-loss vehicle based on a CCC report] represent the average of the potential class members, as Defendant does in its Notice of Removal, is likely insufficient to meet a preponderance of the evidence standard." (citing *Dudley, supra*)).

That said, the court's own review of the Complaint reveals it to contain an allegation that, as a result of Defendants' alleged scheme, "Garrison has retained significant funds in the millions of dollars by underpaying Plaintiff and Class

17

Members."  (Compl. ¶ 50).  A plaintiff's claimed sum of damages is generally

accepted so long as it is made in good faith, that is, unless it appears to a legal

certainty that the claim must be for less.  *St. Paul Mercury Indem. Co. v. Red Cab*

*Co.*, 303 U.S. 283, 288-89 (1938).  The court finds that Plaintiff's above assertion

that Garrison unlawfully withheld from the class funds in the "millions," plural, of

dollars reasonably puts in controversy compensatory damages of at least $2 million

for aggregate economic loss.[6]  *See, e.g., Novotny v. Panasonic Consumer Elecs.*

---

[6] Alabama law also allows recovery of compensatory damages for emotional distress for the tort of bad faith, despite that such damages typically do not lie for a claim *ex contractu* for breach of an insurance policy.  *See Dempsey v. Auto Owners Ins. Co.*, 717 F.2d 556, 561-62 (11th Cir. 1983); *Gulf Atl. Life Ins. Co. v. Barnes*, 405 So. 2d 916, 925 (Ala. 1981); *United Am. Ins. Co. v. Brumley*, 542 So. 2d 1231, 1238 n. 4 (Ala. 1989).  Thus, federal courts frequently consider such damages as part of the amount in controversy in Alabama bad-faith cases.  *See, e.g., Koester v. State Farm Ins. Co.*, 2012 WL 5265783, at *5 (N.D. Ala. Oct. 22, 2012); *Robinson v. Affirmative Ins. Holdings, Inc.*, 2013 WL 838285, at *4 (N.D. Ala. Mar. 1, 2013).  However, Garrison's Notice of Removal does not ask the court to do so.  Perhaps that's because the Complaint neither pleads that Plaintiff or class members suffered emotional distress nor requests damages for such harm expressly.  It is debatable whether such an omission might preclude recovery of emotional distress damages on the theory that they are an item of "special damage" under Alabama law that must be "specifically stated" under Rule 9(g), Fed. R. Civ. P.  *See Great Am. Indem. Co. v. Brown*, 307 F.2d 306, 308 (5th Cir. 1962); *Baldwin v. Panetta*, 4 So. 3d 555, 565-66 (Ala. Civ. App. 2008) (holding that, for purposes of the analogous Rule 9(g), Ala. R. Civ. P., damages for mental anguish are "general damages" that do not have to be specifically pled where they are subject to being recovered on a claim for breach of contract (citing *Walker Builders, Inc. v. Lykens*, 628 So. 2d 923, 923 (Ala. Civ. App. 1993)); *Lay v. Postal Tel. Cable Co.*, 54 So. 529, 531 (Ala. 1911) (holding, seemingly contrary to *Baldwin* and *Walker Builders, supra*, that damages for mental anguish are special damages in a contract case that must be pled).  But even assuming emotional distress damages would not be foreclosed, it suffices to say for purposes of estimating the amount in controversy that the Complaint's failure to plead such injury and Garrison's lack of any value estimate therefor would render any allocation of a substantial sum for such potential damages overly speculative.  *See, e.g., Sharritt v. Liberty Mut. Ins. Co.*, 2005 WL 1505994, at *2 (S.D. Ala. June 24, 2005); *Moore v. Allstate Indem. Co.*, 2006 WL 2730743, at *3 (S.D. Ala. Sept. 22, 2006); *Lowe v. State Farm Fire & Cas. Co.*, 2016 WL 818658, at *6 (M.D. Ala. Feb. 16, 2016), report and recommendation adopted, 2016 WL 821132 (M.D. Ala. Mar. 2, 2016).  That is particularly true insofar as the court does not view Defendants' alleged misconduct, *i.e.*, undervaluing the replacement cost of total-loss vehicles of Garrison's Alabama

*Co.*, 2010 WL 11596460, at *2 (C.D. Cal. Oct. 1, 2010) ("While Plaintiff does not specify the specific sum that he seeks in disgorgement, Defendant correctly contends that Plaintiff's use of the plural form of the word 'million' means that Plaintiff is seeking at least an additional $2 million ...."). That leaves approximately $3 million to meet CAFA's $5 million amount in controversy requirement.

Given Plaintiff's bad-faith claim and other intentional tort claims, the court must also consider his demand for punitive damages as part of the amount in controversy. *See Holley Equip. Co. v. Credit Alliance Corp.*, 821 F.2d 1531, 1535 (11th Cir. 1987); *Dempsey*, 717 F.2d at 561-62. The Eleventh Circuit has recognized, albeit in an unpublished and thus non-binding opinion, *see* 11th Cir. R 36-2, that a removing defendant who alleges the CAFA amount in controversy is met "need only prove the jurisdictional facts necessary to establish that punitive damages in an amount necessary to reach the jurisdictional minimum are at issue—that is, that such damages *could* be awarded." *McDaniel v. Fifth Third Bank*, 568 F. App'x 729, 731 (11th Cir. 2014) (emphasis original). That is, the *McDaniel* court suggested, once such jurisdictional facts have been shown, "unless recovery of an amount exceeding the jurisdictional minimum is legally impossible, the case

---

insureds by a few hundred to a thousand dollars each, to be the sort that would obviously or inherently lead to significant emotional distress. To the contrary, it's the type of wrong of which, even if it occurred, many class members might have been blissfully unaware.

belongs in federal court." *Id.* at 732 (quoting *Back Doctors Ltd. v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 831 (7th Cir. 2011)); *see also Dart Cherokee Basin*, 574 U.S. at 88 (suggesting that it may be "anomalous to treat commencing plaintiffs and removing defendants differently with regard to the amount in controversy.").

The Alabama Supreme Court has frequently recognized that a three-to-one ratio of punitive damages to compensatory damages is reasonable and legally permissible in most instances.[7] *See Merchants FoodService v. Rice*, 286 So. 3d 681, 710-11 (Ala. 2019) (citing and discussing other cases). In light of that benchmark, the court finds by a preponderance that it is not apparent that Plaintiff could not plausibly seek or recover at least $3 million in punitive damages. Plaintiff claims that Defendants engaged in concerted scheme causing at least $2 million in economic losses to thousands of Alabama consumers, so a $3 million punitive award would represent a ratio to compensatory damages of no more than 1.5 to 1, which falls easily within the range allowed by Alabama law. *See McDaniel*, 568 F. App'x at 731-32; *see also Alabama River Grp., Inc. v. Conecuh Timber, Inc.*, 261 So. 3d 226, 278 (Ala. 2017) (remitting punitive damages, based

---

[7] By statute, Alabama caps punitive damages in most civil actions. *See* Ala. Code § 6-11-21. For example, had Plaintiff filed this action on behalf of just himself, punitive damages would be limited to three times compensatory damages or $500,000, whichever is greater. *See id.*, § 6-11-21(a). However, Plaintiff filed this case as a class action. By its terms, the cap statute does not apply to such actions. *Id.*, § 6-11-21(h).

largely on a 3:1 ratio, to about $3.2 million based on economic losses of about $1.09 million suffered by seven plaintiff companies victimized by fraudulent scheme); *Krikorian v. Ford Motor Co.*, 2019 WL 7042939, at *8 (S.D. Ala. Nov. 6, 2019), *report and recommendation adopted*, 2019 WL 7038265 (S.D. Ala. Dec. 20, 2019).  The court therefore also finds that CAFA's aggregate, $5 million amount-in-controversy element is met based on potential compensatory and punitive damages for the class.  Having satisfied itself that subject-matter jurisdiction is present, the court turns to Defendants' pending motions.

## III.   The Motions to Compel Appraisal and to Stay or Dismiss

Defendants have moved to compel Plaintiff to submit to an appraisal of his vehicle and to dismiss or stay the action pending such appraisal.  (Docs. 20 & 21). Ultimately, both Defendants ask in their respective reply briefs that the court stay the action pending a compelled appraisal, rather than dismiss it.  (Doc. 44 at 4, 15; Doc. 45 at 8).  In so doing, Defendants do not dispute that Plaintiff's vehicle was covered under the policy or that it was a total loss.  Rather, both Defendants' motions are founded on the proposition that Plaintiff is barred from proceeding on any of his claims against them in a judicial forum unless and until he complies with their demands for an appraisal pursuant to a clause in the policy stating as follows:

> If we and you do not agree on the amount of loss, either may demand an appraisal.  In this event, each party will select a competent appraiser.  The two appraisers will select an umpire.  The appraisers will state separately the actual cash value and the amount of loss.  If

they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will be binding. Each party will pay its chosen appraiser and share the expenses of the umpire equally. Neither we nor you waive any rights under this policy by agreeing to an appraisal.

(Doc. 1-2 at 75).  Defendants also reference another provision of the Policy stipulating that "no legal action may be brought against [Garrison] until there has been full compliance with all the terms of the policy."  (*Id.* at 77).  CCC acknowledges that it is not a party to the insurance contract between Plaintiff and Garrison.  CCC maintains, however, that, under the doctrine of equitable estoppel, it has a right to compel an appraisal and seek a stay until it is completed.

Garrison's motion also includes declarations from two individuals, John Rivera, a Garrison "Total Loss Adjuster" (Doc. 20-1), and Andrea Wiltrout, one Garrison's attorneys in this action.  (Doc. 20-2).  Rivera essentially relates certain events and communications involved with Garrison's handling of Plaintiff's insurance claim, attaching a copy of the "Claim Notes" from Garrison's file.  (Doc. 20-1 at 1-20).  Rivera starts by stating that, after Garrison sent the initial CCC report dated May 23, 2019, finding that Plaintiff's vehicle had an actual cash value of $17,280.33, Plaintiff and his father called to complain that some of the "comparable vehicles" listed on the report had higher mileage than Plaintiff's.  (Id. at 2, ¶¶ 7-8).  That prompted Garrison to request a new report from CCC with "more direct" comparable vehicles.  (*Id.* ¶ 9).  CCC complied, creating the second

22

report that valued Plaintiff's vehicle at $18,163.34, a copy of which was emailed to him on June 3, 2019.  (*Id.* ¶ 10).  The next day, Garrison offered Plaintiff a settlement based on that second CCC valuation, less the $500 policy deductible. (*Id.* ¶ 11).  On June 5th and 6th, Plaintiff sent receipts for a number of items he believed to increase the vehicle's value, including a documentation fee, floor mats, a cargo cover, a tire warranty, and windshield wipers.  (Doc. 20-1 at 2-3, ¶¶ 12-13). On June 7th, Garrison informed Plaintiff that it did not consider any of those items to increase the value of the vehicle for purposes of the policy but informed him that he could go to the "salvage yard" and remove the floor mats, cargo cover, and wipers.  (Doc. 20-1 at 3, ¶ 14).  On June 12th, Rivera asserts, Garrison made an electronic transfer to Plaintiff's bank account in the amount of $17,678.34, based on the second CCC report valuation, less the policy's $500 deductible.  (*Id.* ¶ 15). The court notes that the Garrison's file further indicates that Garrison sent another electronic payment to Plaintiff later the same day for $500, representing a waiver of the deductible.  (Doc. 20-1 at 17).  Nothing in the claim file indicates that Plaintiff thereafter disputed the amount of the settlement to Garrison, which closed the first-party claim on August 22, 2019.  (*Id.* at 18).

Wiltrout's declaration, in turn, relates to Garrison's invocation the appraisal clause shortly after Plaintiff filed this action in state court on September 16, 2019 and Garrison was served on September 23rd.  (*See* Doc. 1-2 at 142).  Attached to

Wiltrout's declaration is a letter dated October 4, 2019, from another one of Garrison's attorneys in the case, Thomas Butler, sent to Plaintiff's counsel, giving notice that Garrison was demanding an appraisal under the Policy, further asking that Plaintiff voluntarily dismiss this action.  (Doc. 20-2 at 1-3).  Later that same day, Plaintiff's counsel sent a reply email refusing that request, asserting that Garrison had waived, and is estopped from raising, its rights under the appraisal clause.  (*Id.* at 4).

A federal court generally applies the substantive law of the forum state in a diversity case.  *Galindo v. ARI Mut. Ins. Co.*, 203 F.3d 771, 775 (11th Cir. 2000).  Appraisal clauses in insurance policies similar to the one here, in which either party may demand an appraisal if there is a disagreement over the amount of a loss, have long been deemed generally enforceable under Alabama law.  *See McCullough v. Mill Owners Mut. Fire Ins. Co.*, 8 So. 2d 404, 407-08 (Ala. 1942); *Headley v. Aetna Ins. Co.*, 80 So. 466, 467-68 (Ala. 1918); *see also, e.g.*, *Southeast Nursing Home, Inc. v. St. Paul Fire & Marine Ins. Co.*, 750 F.2d 1531, 1538-39 (11th Cir. 1985); *Moore v. Travelers*, 321 F. App'x 911, 912-13 (11th Cir. 2009).  There are differences between such covenants and contracts that require parties to submit disputed liability entirely to arbitration in lieu of going to court.  *See Southeast Nursing Home, Inc.*, 750 F.2d at 1537; *Casualty Indem. Exch. v. Yother*, 439 So. 2d 77, 79-80 (Ala. 1983); *see also Headley*, 80 So. at 467.  Nevertheless,

24

appraisal and arbitration agreements are analogous enough to each other that courts faced with an application to enforce either generally employ similar review procedures and standards.  *See Walker v. Allstate Prop. & Cas. Ins. Co.*, 2020 WL 1235626, at *3 n. 4 (N.D. Ala. Mar. 10, 2020); *Rogers v. State Farm Fire & Cas. Co.*, 984 So. 2d 382, 386-87 (Ala. 2007) (holding that elements of waiver of appraisal clause same as for waiver of arbitration agreement); *Galindo*, 203 F.3d at 776 (recognizing that, under Florida law, "[a]ppraisal in a homeowner's insurance policy is treated as an arbitration provision, 'narrowly restricted to the resolution of specific issues of actual cash value and amount of loss.'" (quoting *United States Fidelity & Guar. Co. v. Romay*, 744 So. 2d 467, 469 (Fla. Dist. Ct. App. 1999) (en banc)).

Plaintiff does not dispute that appraisal clauses may be enforced at times, but he insists Defendants may not do so here, in whole or in part, on what amount to four grounds.  The court lays them out here in the order they will be addressed. First, Plaintiff contends that CCC has no right to demand an appraisal because it is not a party to the insurance contract containing the appraisal clause and cannot otherwise enforce it.  Second, Plaintiff argues that he is not barred from pursuing any of his claims because the policy's appraisal clause is, he says, is "optional" rather than "mandatory" and thus cannot "serve as a precondition to filing suit." (Doc. 40 at 8; *see also* Doc. 39 at 9).  Third, Plaintiff contends that Garrison

waived its right to demand an appraisal, is estopped from doing so, or both, such that all claims against both Defendants are due to proceed.  And fourth, Plaintiff maintains that the scope of the appraisal clause does not reach at least certain individual claims and that those should proceed.

### A.    CCC's Right to Enforce Appraisal

The first issue the court considers is whether CCC has a right to demand an appraisal or otherwise enforce rights under the appraisal clause as it relates to the claims against it.  Plaintiff insists that, whatever rights that Garrison might have on that front, CCC has none.  In support, Plaintiff highlights that CCC is not a party to the insurance contract between Plaintiff and Garrison containing the appraisal clause.  CCC concedes that circumstance, as well as that it would generally imply it lacks legal rights under that agreement.  CCC contends, however, that it can nevertheless demand an appraisal and enforce rights under the appraisal clause pursuant to the doctrine of equitable estoppel.  It is there that the issue is joined, for Plaintiff maintains that equitable estoppel does not apply.  The court agrees with Plaintiff.

The parties stipulate that the principles of equitable estoppel as applied by the Alabama courts in the context of enforcement of arbitration agreements by non-signatories also translate to assess whether CCC may, by that same doctrine,

enforce rights under the appraisal clause.  The court thus assumes likewise.  To

that end, the Alabama Supreme Court has stated as follows:

> "A party typically manifests its assent to arbitrate a dispute by signing
> the contract containing the arbitration provision.  *Ex parte Stamey*,
> 776 So. 2d 85, 88–89 (Ala. 2000). One of the key exceptions to this
> rule is the theory of equitable estoppel, under which a nonsignatory
> can enforce an arbitration provision when the claims against the
> nonsignatory are ' " 'intimately founded in and intertwined with' " '
> the underlying contract obligations. *Stamey*, 776 So. 2d at 89 (quoting
> *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757
> (11th Cir. 1993), *quoting in turn McBro Planning & Dev. Co. v.
> Triangle Elec. Constr. Co.*, 741 F.2d 342, 344 (11th Cir. 1984))."

*Smith v. Mark Dodge, Inc.*, 934 So.2d 375, 380 (Ala. 2006).

CCC argues that Plaintiff's claims against CCC qualify as sufficiently

founded in and intertwined with underlying insurance contract obligations for

purposes of claiming equitable estoppel.  Plaintiff does not dispute the point, so,

again, the court assumes as much.  Plaintiff maintains, however, that CCC still

cannot avail itself of equitable estoppel because the appraisal clause itself limits

the right to demand an appraisal only to Garrison and its insured based on

disagreements between them.

Plaintiff here relies upon what the Alabama Supreme Court has called an

"exception" to equitable estoppel.  Under it, even if claims against a nonsignatory

qualify as intertwined with contractual obligations, the courts will not require such

claims to be arbitrated where the language of the arbitration provisions limits

arbitration to the signing parties.  *See Locklear Auto. Grp., Inc. v. Hubbard*, 252

27

So. 3d 67, 86 (Ala. 2017).  In other words, the Alabama Supreme Court has stated,

"if the language of the arbitration provision is party specific and the description of

the parties does not include the nonsignatory, [the] inquiry is at an end, and we will

not permit arbitration of claims against the nonsignatory."  *Id.* (quoting Smith, 934

So. 2d at 381).

The court agrees with Plaintiff that the appraisal clause here is "party

specific" and forecloses any reasonable interpretation that it might authorize

demands by non-parties like CCC.  Again, the clause provides:

> If *we and you do not agree* on the amount of loss, *either* may demand
> an appraisal.  In this event, *each party* will select a competent
> appraiser.  The *two* appraisers will select an umpire.  The appraisers
> will state separately the actual cash value and the amount of loss.  If
> they fail to agree, they will submit their differences to the umpire.  A
> decision agreed to by any two will be binding.  Each party will pay its
> chosen appraiser and share the expenses of the umpire equally.
> Neither we nor you waive any rights under this policy by agreeing to
> an appraisal.

(Doc. 1-2 at 75 (emphasis added)).  The policy, of course, defines the terns "we" to

mean Garrison and "you" to mean the insured, Plaintiff.  CCC acknowledges that

the clause "gives Plaintiff and Garrison the right to demand appraisal," but CCC

says "it does not limit appraisal to disputes solely between Garrison and Plaintiff."

(Doc. 45).  The court concludes, however, that the appraisal clause plainly does

just that.  It unambiguously provides that an appraisal becomes an available

remedy "if [Garrison] and [the insured] do not agree on the amount of the loss."

28

No mention is made of third parties who might not "agree on the amount of the loss," nor is there any suggestion that if they did not "agree" they might have any rights.  Rather, the provision allows only that "either," meaning one of the two previously identified parties, Garrison and the insured, may make a demand.  It is also clear that from the outlined appraisal procedure that there are to be only two appraisers, one retained by Garrison and one by the insured, along with an umpire to break a tie between those two appraisers, if necessary.  Plainly, there is no contemplation of either a third party participating or a third appraiser.  Because the appraisal clause limits a demand and participation only to the insurer and the insured when those two might not agree on the amount of a loss, CCC cannot rely on the doctrine of collateral estoppel to enforce any right of appraisal under the policy.  CCC's motion to compel an appraisal will thus be denied.

### B.  Appraisal Clause as "Optional"

Although CCC has no enforceable rights under the appraisal clause, there is still the matter of Garrison's motion to compel an appraisal.  Plaintiff first argues that Garrison's motion is due to be denied on the theory that the appraisal clause is "optional" and therefore it cannot bar him from pursuit of any claims.  Plaintiff emphasizes that the policy language specifies that, in the event of a disagreement over the amount of a claimed loss, "either [the insurer or the insured] *may* demand an appraisal." (emphasis added).  The court would agree with Plaintiff insofar as he

29

is asserting that the Policy does not require *him* to have demanded an appraisal before filing this lawsuit.  (Doc. 39 at 9 n. 6 ("Plaintiff's decision not to exercise his option to invoke appraisal prior to filing suit in no way prevents him from being in 'full compliance with the Policy ….'")).  The appraisal clause uses the permissive "may," not a mandatory term like "must," "shall," or "will," when setting out the parties' right to demand an appraisal.  As such, the policy does not oblige the insured to demand an appraisal as a precondition to filing suit against the insurer for an alleged failure to pay "actual cash value" for his vehicle.  *See Shufford v. Integon Indem. Corp.*, 73 F. Supp. 2d 1293, 1300 (M.D. Ala. 1999) ("[B]y stating that policy-holders 'may' demand an appraisal rather than that they must do so, the policy in no way suggests that this clause contains a requirement that must be fulfilled before [the insurer] may be held liable.").

But whether *Plaintiff* had to demand an appraisal is a red herring.  The appraisal clause allows *either* the insured *or* the insurer to demand an appraisal, and it is undisputed that Garrison gave notice of such a demand about three weeks after being served in this case.  The germane question, then, is whether Plaintiff is authorized to proceed on his claims in this court in the face of *Garrison's* outstanding demand for an appraisal.  On that front, the appraisal clause provides that, once either party demands an appraisal, the parties, the appraisers, and the umpire "will" take certain enumerated actions and that a valuation decision "will

be binding." That indicates that once either party demands an appraisal, the process becomes mandatory for the other and an insured's failure to comply may preclude a suit for breach. *See Moore*, 321 F. App'x at 913 & n. 3 (although appraisal provision stated merely that either party "can" make a demand, the court held that the insured was "contractually bound" to "comply with appraisal provision to determine the amount of his loss" before filing suit[8]); *Milligan v. CCC Info. Servs. Inc.*, 920 F.3d 146, 152 n. 4 (2nd Cir. 2019) (recognizing that, although policy stated that either the insured or the insurer "may" demand an appraisal, that process, under New York law, "is not voluntary. While the process need not be invoked by either the insured or insurer, either party may demand it; and once either does, appraisal is mandatory."); *McGowan v. First Acceptance Ins. Co., Inc.*, 411 F. Supp. 3d 1293, 1296-97 (M.D. Fla. 2019) ("Florida law recognizes that even though an appraisal clause includes the word 'may,' … the right to appraisal is not permissive but is instead mandatory, so once a demand for appraisal is made, neither party has the right to deny that demand." (internal quotation marks and citation omitted); *Walker*, 2020 WL 1235626, at *3 (wherein Judge Proctor

---

[8] *Moore* is an Eleventh Circuit decision interpreting Alabama state law. Because the opinion is not published in the Federal Reporter, it is not binding precedent, although it still may be considered for its persuasive authority. *See* 11th Cir. R. 36-2; *United States v. Futrell*, 209 F.3d 1286, 1289 (11th Cir. 2000).

recently rejected this same "permissive/mandatory" argument in another putative class action raising the same claims against CCC and a different auto insurer).

Plaintiff fails to cite any case interpreting an appraisal clause as permitting a party simply to choose unilaterally not to participate in the appraisal process when the other party validly invokes it.  Indeed, any right to an appraisal under the policy would be illusory if one party's demand could simply be ignored by the other with impunity.  Likewise, Plaintiff's proposed reading of the appraisal clause renders it gratuitous.  Specifically, parties to an insurance contract can always *mutually agree* to settle a dispute through a third-party appraisal or arbitration rather than by going to court; the parties don't need the policy to say so.  Plaintiff's assertion that his compliance with Garrison's appraisal demand is merely "optional" is without merit.[9]

## C.    Implied Waiver and Equitable Estoppel

Plaintiff also contends that none of his claims are barred because Garrison waived its right under the Policy to demand an appraisal, is equitably estopped to do so, or both.  Waiver and estoppel are closely related legal doctrines, though they

---

[9] Indeed, in a footnote in his brief in opposition to CCC's motion, Plaintiff effectively concedes that, once demanded, an appraisal is mandatory.  Plaintiff there recognizes that that once "either" party makes a demand, at least if "timely," the appraisal process becomes "required" and its result "binding."  (*See* Doc. 40 at 9 n. 8).  While Plaintiff also goes on to argue that neither party made a "timely" demand, that might go only to whether Garrison unduly delayed in making its demand so as to give rise to waiver or estoppel, matters discussed later, and not to whether Plaintiff's compliance with a Garrison's demand is simply at Plaintiff's option.

are technically distinct.  *See Inland Mut. Ins. Co. v. Hightower*, 145 So. 2d 422,

425 (Ala. 1962); *Blue Cross & Blue Shield of Ala., Inc. v. Taylor*, 370 So. 2d 1040,

1042 (Ala. Civ. App. 1979); *Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341,

1347 (11th Cir. 1994); *Mitchell v. Aetna Cas. & Sur. Co.*, 579 F.2d 342, 347-48

(5th Cir. 1978).[10]  Courts commonly define "waiver" as the voluntary surrender of

a known right.  *See, e.g.*, *Mobile Cty. v. Rich*, 216 So. 3d 1184, 1199 (Ala. 2016)*;

Ex parte Spencer*, 111 So. 3d 713, 718 (Ala. 2012); *Alabama State Docks v. Saxon*,

631 So. 2d 943, 946 (Ala. 1994).  Waiver can be expressly stated or implied by a

party's conduct that is inconsistent with an intention to enforce its right.  *Hughes v.

Mitchell Co.*, 49 So. 3d 192, 201-02 (Ala. 2010); *Madison Cty. v. Evanston Ins.

Co.*, 340 F. Supp. 3d 1232, 1279 (N.D. Ala. 2018).  Equitable estoppel, on the

other hand, generally requires a showing (1) that the party sought to be estopped,

having knowledge of relevant facts, communicates something in a misleading way,

either by words, conduct, or silence, with the intention that another party will act

on the communication, (2) that the other party, who lacks knowledge of the

relevant facts, relies on the communication, and (3) would be materially harmed if

the communicating party were permitted to take a position inconsistent with his

---

[10] Decisions of the Fifth Circuit handed down before October 1, 1981, are binding precedent in
the Eleventh Circuit. *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en
banc).

earlier conduct. *EvaBank v. Traditions Bank*, 258 So. 3d 1119, 1123-24 (Ala. 2018).

Estoppel and waiver are thus similar, broadly speaking, in that both involve a claim that one's adversary should be precluded from invoking a legal right it otherwise possesses because that adversary previously said or did something, or failed to say or do something, so as to suggest that it was not going to enforce the right. Indeed, courts often note that the same facts may, but need not, establish both waiver and estoppel. The principal difference, they say, is that waiver focuses upon whether the conduct of the party against whom waiver is asserted evidenced its intent to relinquish the right whereas estoppel depends on the conduct of both parties and always requires the party claiming estoppel to show detrimental reliance or other material prejudice. *See Hightower*, 145 So. 2d at 425; *Liverpool & London & Globe Ins. Co., Ltd., of England v. McCree*, 105 So. 901, 903 (Ala. 1925); *Glass*, 33 F.3d at 1347; *Mitchell*, 579 F.2d at 347-48; *see also* Restatement (Second) of Contracts § 84 cmt. b (1981) ("When the waiver is reinforced by reliance, enforcement is often said to rest on 'estoppel.'").

In the context of the enforcement of both arbitration and appraisal agreements, however, the requirements of waiver and estoppel under Alabama law tend to merge such that they may be difficult to distinguish. In *Rogers*, *supra*, the Alabama Supreme Court held that a claim of waiver interposed to defeat an

opponent's demand for an appraisal under an insurance policy is subject to the same requirements as a claim of waiver resisting a demand for arbitration.  984 So. 2d at 386-87.  The Court then proceeded to adopt the principal test from its arbitration cases, recognizing that a party may be deemed to have waived its right to an appraisal if it "substantially invokes the litigation process and thereby substantially prejudices the [opposing] party."  *Rogers*, 984 So. 2d at 387 (quoting *Companion Life Ins. Co. v. Whitesell Mfg., Inc.*, 670 So. 2d 897, 899 (Ala. 1995) (emphasis omitted)).  Given that the party claiming waiver must show both (1) conduct clearly inconsistent with enforcement of the contract right and (2) significant prejudice, the requirements of waiver and estoppel largely overlap as a practical matter.  *See generally Schuster v. Prestige Senior Mgmt., LLC*, 376 P.3d 412, 421 (Wash. Ct. App. Div. 3 2016) (observing that federal courts employ only "waiver," not "estoppel," when addressing the unenforceability of arbitration clauses but have incorporated elements of estoppel into waiver); *cf.* Richard Frankel, The Arbitration Clause as Super Contract, 91 Wash. U.L. Rev. 531, 564-67 (2014) (noting that the requirement to show material prejudice to establish waiver of arbitration rights may be contrary to state laws allowing waiver of contract rights generally without necessarily demonstrating prejudice).  Indeed, while Alabama courts routinely consider whether a party has "waived" its right to enforce an arbitration or appraisal agreement, they seem to rarely, if ever, consider

35

whether a party is "estopped" from doing so, or at least if they do, they don't materially distinguish between the two doctrines.  As such, the court will address the parties' arguments relative to Plaintiff's claim of "waiver" with the understanding that the discussion also applies to his claim of "estoppel."

Garrison starts by asserting that Plaintiff cannot establish that Garrison waived its right to an appraisal under the test announced in *Rogers*.  Again, that test requires the party invoking waiver to establish that the party seeking to enforce an appraisal agreement has both "substantially invoked the litigation process" and would suffer "substantial prejudice" if an appraisal were compelled.  Plaintiff candidly admits, however, that it "is not disputed" that Garrison did not "substantially invoke the litigation process" before demanding an appraisal.[11] (Doc. 39 at 15).  Accordingly, the court agrees with Garrison that Plaintiff cannot establish waiver based on *Rogers*.

Plaintiff nevertheless insists that waiver may be found based on Garrison's conduct other than its substantial participation in judicial proceedings.  Plaintiff posits, rather, that waiver may occur by an insurer's having acted "in any manner

---

[11] Plaintiff's concession is well taken.  Garrison gave notice its demand for an appraisal on October 4, 2019, about three weeks after Plaintiff filed the action in the state court and before Garrison had even appeared in the case.  Garrison's first activity in the courts, rather, was to remove the action to this court on October 22, 2019.  No discovery nor anything else material occurred in the litigation thereafter until Defendants filed their motions on November 19, 2019 to compel an appraisal and dismiss.  Garrison's course in the courts, then, belies any intent to litigate in lieu of an appraisal.  *See ClimaStor IV, LLC v. Marshall Const., LLC*, 4 So. 3d 452, 458 (Ala. 2008); *U.S. Pipe & Foundry Co. v. Curren*, 779 So. 2d 1171, 1175 (Ala. 2000).

inconsistent with exercising [its right to appraisal], … including, specifically, the unreasonable delay in asserting contractual rights to the prejudice of the [insured]." (*Id.* at 16).  Garrison did so here, Plaintiff says, by "intentionally delaying its demand for appraisal until *after* Plaintiff filed suit, and, more to the point, *after* the total loss vehicle had been destroyed for salvage and was no longer available for physical appraisal."  (*Id.* at 18 (emphasis original)).

Plaintiff also here relies on allegations to like effect in the Complaint, which he casts as laying out Garrison's "strategic misuse" of the appraisal clause.  (*Id.* at 16).  Plaintiff starts by pleading that Garrison's "regular practice of refusing to negotiate in good faith" over the value of its insureds total-loss vehicles, knowing that insureds need to purchase a replacement vehicle and "typically have no practical choice other than to accept the total loss payment offered by Garrison." (Compl. ¶¶ 67-68).  And while Plaintiff makes no claim that Garrison did so in his own case, Plaintiff alleges that Garrison also has a "regular practice of threatening to withdraw its offer to pay a total loss if the insured requests an appraisal." (id. ¶ 69).  According to Plaintiff, such "threats of withdrawal"; the time it takes to complete an appraisal, which Plaintiff estimates at 45 days "or more"; and the appraisal clause's stipulation each party will pay for its own appraiser and split the cost of the umpire, all "present bad faith obstacles to a fair appraisal."  (Id. ¶¶ 69-70).

Plaintiff further pleads that "even when there is a clear and material dispute with an insured," Garrison has a "regular practice" of invoking the appraisal clause, as here, only after an insured has filed a lawsuit. (Compl. ¶ 72). Plaintiff claims he would suffer prejudice if Defendants' post-suit demand were enforced because Garrison sold his vehicle for salvage before suit was filed, making it unavailable for an inspection in an appraisal. (*Id*. ¶ 75). This too, Plaintiff says, is representative of Garrison's regular practices, as Plaintiff alleges that Garrison "typically" sells total loss vehicles of its insureds for salvage value within 30 to 45 days after the loss. (*Id*. ¶ 74). Garrison thus has "actual knowledge" that a total vehicle will thus be unavailable for inspection in an appraisal "if an insured disputes Garrison's total loss payment but does not demand an appraisal." (*Id*. ¶ 75).

The court assumes it may be possible in a given case to establish that a party has waived or is estopped from enforcing an appraisal agreement based on "inconsistent" conduct other than a party's participation in judicial proceedings. *See Ex parte Costa & Head (Atrium), Ltd.*, 486 So. 2d at 1276 (observing in dicta that that a waiver of a right to arbitrate may occur "when a party 'actively participates in a lawsuit *or takes other action inconsistent with' the right to arbitration*." (*quoting In re Mercury Constr. Corp.*, 656 F.2d 933, 939 (4th Cir. 1981), *aff'd sub nom. Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460

U.S. 1 (1983) (*quoting N & D Fashions, Inc. v. DHJ Indust., Inc.*, 548 F.2d 722, 728 (8th Cir. 1976) (emphasis added)); *Jadick v. Nationwide Prop. & Cas. Ins. Co.*, 98 So. 3d 5, 12 (Ala. Civ. App. 2011) (insured "waived" its right to enforce appraisal provision against insurer where insured waited until 15 months after the claim had been paid in full and after the insured had repaired the damaged property to seek an appraisal).

That said, insofar as Plaintiff argues that Garrison waived its right to an appraisal by "strategically" invoking a demand, as it routinely does, only after its insured files a lawsuit, caselaw dealing with arbitration establishes that such a circumstance is not a waiver. *See Ex parte Dees*, 594 So. 2d 77, 80 (Ala. 1992); *Ex parte Costa & Head (Atrium), Ltd.*, 486 So. 2d 1272, 1277 (Ala. 1986), *overruled on other grounds by Ex parte Jones*, 628 So. 2d 316 (Ala. 1993), *and F.A. Dobbs & Sons, Inc. v. Northcutt*, 819 So. 2d 607 (Ala. 2001); *see also African Methodist Episcopal Church, Inc. v. Smith*, 217 So. 3d 816, 835 (Ala. 2016) ("Recent cases have only found waiver where the demand for arbitration came long after the suit commenced ….") (*quoting Ex parte Costa & Head (Atrium), Ltd.*, *supra* (internal quotation marks, emphasis, and further citation omitted)); *accord Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1223 (11th Cir. 2000); *E.C. Ernst, Inc. v. Manhattan Constr. Co.*, 551 F.2d 1026, 1040 n. 39 (5th Cir. 1977); *General Guar. Ins. Co. v. New Orleans Gen. Agency, Inc.*, 427 F.2d 924,

928 (5th Cir. 1970); *Southside Internists Grp. PC Money Purchase Pension Plan v. Janus Capital Corp.*, 741 F. Supp. 1536, 1539 (N.D. Ala. 1990).  For example, in *Ex parte Costa & Head (Atrium), Ltd.*, the Alabama Supreme Court explained that, despite an acknowledged pre-suit disagreement, there was "no requirement" that the defendants demand arbitration before the action was filed, for their "duty … either to request arbitration or waive that right did not become critical until actual litigation was pending …."  486 So. 2d 1277; *see also General Guar. Ins. Co.*, 427 F.2d at 928 ("Requiring pre-suit demand will place on the party sought to be charged the duty to institute proceedings which may establish his own liability, though if he remains inactive the claims asserted against him may never be formally pressed in either arbitration or court proceedings....").

Plaintiff also seeks to establish waiver based on prejudice stemming from the fact that the policy would obligate him to pay for an appraiser and split the costs of an umpire and that the appraisal process would take time to complete. (*See* Doc. 39 at 6 & n. 3 (citing Compl. ¶¶ 80-81)).  It is true that waiver may be shown by prejudice arising "where the party seeking [appraisal] allows the opposing party to undergo the types of litigation expenses that [appraisal] was designed to alleviate."  *Rogers*, 984 So. 2d at 387 (citations omitted).  But none of the items Plaintiff cites here are avoidable "litigation expenses" in the sense that they were incurred in a judicial proceeding prior to an appraisal demand.  Nor

would they be the product of Garrison's alleged "delay" in demanding an appraisal. Rather, they are burdens associated with the appraisal process itself to which Plaintiff is deemed to have contractually agreed, and they would be borne irrespective of which party makes a demand or when. Thus, money and time a party might expend on an appraisal cannot not serve as prejudice establishing waiver. *See Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc.*, 380 F.3d 200, 208 (4th Cir. 2004) (holding likewise with respect to arbitration fees); *Long v. BDP Int'l, Inc.*, 919 F. Supp. 2d 832, 848 (S.D. Tex. 2013) (same).

That leaves Plaintiff's argument that Garrison waived its right to an appraisal by failing to make a demand until after Garrison had sold his vehicle for salvage. According to Plaintiff, that caused him prejudice because his vehicle is no longer available for a physical inspection in an appraisal. Garrison does not dispute either that it sold Plaintiff's vehicle for salvage or that such has resulted in the vehicle being no longer available for a physical inspection. Nevertheless, the court concludes that Plaintiff has nowhere alleged, never mind presented any evidence of, specific facts from which it might be reasonably inferred either (1) that Garrison's sale of Plaintiff's vehicle for salvage was actually "inconsistent" with its later appraisal demand or (2) that Plaintiff would suffer substantial prejudice if the court were to compel an appraisal, both of which would be required to establish waiver here.

41

The court notes at the outset that, contrary to Plaintiff's suggestion, his argument here is not truly about Garrison's "delay" as such in making an appraisal demand.  That is, if Plaintiff's vehicle could still be found and inspected, this claim of prejudice would evaporate, no matter how long Garrison might have waited to make a demand.  Rather, Plaintiff's claim is about Garrison's act of having *sold* the vehicle for salvage, making it *unavailable* for an inspection, and Garrison then demanding an appraisal thereafter.  On that score, Plaintiff complains that Garrison regularly sells total-loss vehicles of its insureds for salvage and that when Garrison does so, it has "actual knowledge" that those vehicles will be made unavailable "if an insured disputes Garrison's total loss payment."  (Compl. ¶ 75).  Plaintiff thus suggests that such sales are inconsistent with a subsequent demand by Garrison for an appraisal, on the theory that the unavailability of the vehicle for inspection precludes or at least substantially frustrates a fair appraisal.  The court disagrees.

For starters, there is *always* going to be that "if" of which Plaintiff speaks. That is, there is always a *chance*, with every first-party, total-loss claim that the insured might later decide to sue over Garrison's settlement valuation, at which point Garrison might try to demand an appraisal.  Garrison presumably knows all that whenever it disposes of such a vehicle.  Plaintiff, however, offers no authority to support that knowledge of that possible scenario should prohibit the insurer

indefinitely from exercising a right to dispose of a wrecked vehicle[12] upon pain of being deemed to have waived its right to demand an appraisal if it is later sued.

Indeed, at least absent a showing that, at the time of the sale, Garrison was aware of circumstances from which it should have reasonably anticipated that Plaintiff intended to sue over Garrison's valuation, the court fails to see how Garrison's salvage sale of Plaintiff's vehicle might be viewed as "inconsistent" with Garrison's later appraisal demand. In other words, why should Garrison be worried about preserving the vehicle for a potential appraisal unless Garrison had reason to believe that there remained, at a minimum, a serious, ongoing dispute over vehicle's value? There is no evidence, or even allegations, from Plaintiff to support that Garrison had any such reason to believe that. Plaintiff alleges, albeit only in his brief, that he "verbally objected in numerous telephone calls to Garrison regarding both the CCC valuations" he received on his vehicle. (Doc. 39 at 7 n. 4). Indeed, Garrison's adjuster and the claim file notes confirm as much. But that same evidence further shows that, after receiving Plaintiff's complaints about the second CCC report, Garrison advised him on June 7, 2019 that it would not alter its valuation and that he might go to a "salvage yard" where the vehicle was then located and remove certain items from it. Garrison also offers proof that, on June

---

[12] Plaintiff does not dispute that, issues of waiver and estoppel aside, Garrison was generally entitled to sell his total-loss vehicle for salvage after it appeared the parties had settled Plaintiff's first-party claim.

12, 2019, it sent electronic payments to Plaintiff totaling approximately $18,000, based on the valuation in the second CCC report, purporting to represent full settlement of his first-party claim.  In the face of that, Plaintiff does not allege that he refused Garrison's settlement payments, threatened to demand an appraisal or sue, or otherwise promptly protested the settlement's adequacy.  Rather, from all that appears from the record, Plaintiff only disputed it some three months later when he filed this lawsuit, by which time, he now laments, Garrison had sold the vehicle.  Plaintiff thus fails to prove or even allege facts suggesting that Garrison should have seen this action coming such that Garrison's sale of Plaintiff's vehicle might be viewed with suspicion in light of its later appraisal demand.

But even assuming *arguendo* that Plaintiff could establish that Garrison anticipated this lawsuit or should have, the court would still not deem Garrison's act of selling the vehicle to be "inconsistent" with its later appraisal demand because Plaintiff has not alleged facts supporting that a valid appraisal could not reasonably be had absent a physical inspection.  That is, if a valid appraisal could be done without the vehicle, Garrison's sale would not itself serve as a material impediment should Garrison later find itself desiring an appraisal.  Plaintiff asserts that without the vehicle, a "fair[ ] review" would be "obviously impossible." (Compl. ¶ 79).  However, he fails to cite any legal authority for that claim.  *See Walker*, 2020 WL 1235626, at *5 (summarily rejecting an insured's likewise

44

"unsupported conclusion" that he has a " 'right' to an inspection-based appraisal").

Indeed, many cases recognize that "desktop" appraisals based on photographs,

records, and other documents, rather than a physical inspection, are reliable and

otherwise valid.  *See In re Ooida Risk Retention Grp., Inc.*, 475 S.W.3d 905, 913

(Tex. App. 2015) (insurer's decision to allow wrecked truck to be destroyed did

not waive insurer's right to demand an appraisal where appraiser "was in fact able

to place a value on the vehicle with reference to the pictures and specifications

provided"); *Shield Glob. Partners-G1, LLC v. Forster*, 141 N.E.3d 1269, 1273

(Ind. Ct. App. 2020) (finding that the appraiser was not required to personally

inspect the vehicle to appraise it); *In re Gas-Mart USA, Inc.*, 598 B.R. 274, 278

(Bankr. W.D. Mo. 2019) (a "desktop" appraisal "is a recognized form of appraisal

alternative to a standard appraisal and does not lack validity solely for that

reason"); *First Tech. Capital, Inc. v. BancTec, Inc.*, 2017 WL 4254090, at *5 (E.D.

Ky. Sept. 26, 2017) (allowing a "historical desktop appraisal").  And as Garrison

emphasizes, "Plaintiff does not, and cannot allege, his vehicle was not inspected,

or that inspection notes and photographs are not available" for a desktop appraisal.

(Doc. 44 at 12).  To the contrary, Garrison's claim file notes support that

photographs of Plaintiff's vehicle were taken in connection with CCC's valuation

work and sent to Plaintiff on June 5, 2019.  (Doc. 20-1 at 12 (wherein Garrison's

representative documented having emailed the second CCC valuation report to

45

Plaintiff along with "photos of IV [insured vehicle] for review.")). The same considerations likewise support that Plaintiff has not alleged facts supporting that the unavailability of the vehicle would cause him to suffer substantial prejudice if an appraisal were ordered, given the general acceptance of the validity of desktop appraisals.

Based on the foregoing, Plaintiff has failed to allege or prove facts supporting that, prior to demanding an appraisal, Garrison substantially participated in litigation or otherwise engaged in conduct clearly inconsistent with enforcement of its right to an appraisal.  Nor has Plaintiff alleged or proven facts showing that he would suffer substantial prejudice were the court to compel and appraisal.  Therefore, the court concludes, Plaintiff has failed to establish the elements of either waiver or estoppel as would be required to preclude Garrison from invoking rights under the appraisal clause.[13]

---

[13] Plaintiff claims he must be allowed limited discovery on his waiver and estoppel defenses before the court might reject them.  (*See* Doc. 39 at 7-8 & n. 4; Doc. 40 at 6-7).  However, Plaintiff does little more than make a conclusory claim of entitlement coupled with a bald assurance that such discovery "will establish all the elements of waiver and estoppel."  But for the reasons explained in the text, Plaintiff's well-framed factual allegations, whether pled the Complaint or merely set out in his briefs, which the court has credited for instant purposes, are insufficient to make out either waiver or estoppel.  Because Plaintiff's has not justified the need for the sought discovery, the court denies his request.  *See Kayne v. Thomas Kinkade Co.*, 2007 WL 9710108, at *6 (N.D. Ga. Mar. 29, 2007) (denying discovery on defenses to arbitration on the ground that the requesting party failed to "describe what discovery is necessary or how discovery will aid the court in making a determination"), *aff'd*, 249 F. App'x 799 (11th Cir. 2007); *see also City of Miami Gardens v. Wells Fargo & Co.*, 931 F.3d 1274, 1287 (11th Cir. 2019) (holding that a party seeking additional discovery to forestall summary judgment "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified

### D.    The Scope of the Appraisal Clause

Finally, Plaintiff and Garrison clash over the scope of the appraisal clause and whether it prevents Plaintiff from pursuing some or all of his claims against Garrison unless he first submits to an appraisal.  The clause allows either the insured or the insurer to demand an appraisal to settle disagreements "on the amount of the loss."  Garrison casts Plaintiff's entire cause of action as founded upon just such a disagreement because each of his claims depends, Garrison says, upon Plaintiff's being able to establish that Garrison failed to pay "actual cash value" for his vehicle, in violation of the policy.  Garrison posits that circumstance cannot be determined unless and until the appraisal process is completed, so at least the claims against Garrison are due to be stayed pending an appraisal.  The court agrees.

Plaintiff does not seem to dispute that his claims for breach of contract come within the terms of the appraisal clause, assuming that Garrison has otherwise validly invoked it.  That is, Plaintiff argues only that his "non-contractual," "tort claims" lie outside the provision.  (Doc. 39 at 9;  Doc. 40 at 10).  Indeed, it is apparent to the court that Plaintiff's principal claim, Count I against Garrison for

---

facts," but "must specifically demonstrate how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing").

breach of the insurance policy, is based on a disagreement over "the amount of the loss."

Garrison does not dispute liability under the policy.  To the contrary, it deemed Plaintiff's vehicle a total loss and promptly paid his claim.  No causation or coverage issues are presented.  Rather, Plaintiff's claim for breach of the policy is firmly rooted in a simple allegation that Garrison undervalued Plaintiff's vehicle and thereby did not pay its "actual cash value" as that phrase is defined by the policy.  To be sure, Plaintiff couches his claim as also comprised of other purported "breaches," focusing especially upon alleged flaws and improprieties in the "method" CCC uses generally, and Garrison thus relies upon, to derive a value for an insured's total-loss vehicle.  But such underlying means and methods can cause no actual injury insured unless and until Garrison fails to *pay* the "correct" "actual cash value" for an insured's vehicle when Garrison has become obligated to do so under the policy.  And that fundamental disagreement over valuation is plainly one about the "amount of the loss" for purposes of the appraisal clause, which makes no exception where the source of the dispute is the valuation method used.  *See Moore*, 321 F. App'x at 912-13; *Enger v. Allstate Ins. Co.*, 407 F. App'x 191, 193 (9th Cir. 2010); *Bettor v. Esurance Prop. & Cas. Ins. Co.*, 2019 WL 2245564, at *3-4 (S.D. Fla. Mar. 28, 2019); *Bloomgarden v. Allstate Fire & Cas. Ins. Co.*, 2019 WL 2245475, at *3-5 (S.D. Fla. Mar. 15, 2019), *report and*

48

*recommendation adopted in relevant part*, 2019 WL 5209015 (S.D. Fla. Aug. 6, 2019).  Therefore, once a party makes an appraisal demand to resolve such a disagreement, the insurer might become obligated to pay only once the amount is fixed by the appraisal process, so no court action for breach is ripe to proceed until then.  *See Moore*, 321 F. App'x at 913; *Enger*, 407 F. App'x at 193; *Walker*, 2020 WL 1235626, at *6-7 (N.D. Ala. Mar. 10, 2020); *see also Southeast Nursing Home, Inc.*, 750 F.2d at 1538 ("The policy … did not require [the insurer] to pay anything until the appraisal process was concluded and the parties' appraisers, or one of their appraisers and the impartial umpire, decided 'the amount of the loss.'" (footnote omitted)); *J.P.F.D. Inv. Corp. v. United Specialty Ins. Co.*, 769 F. App'x 698, 706 (11th Cir. 2019) ("While … an appraisal award is not a precondition to suit under the policy, it is a precondition to payment of a covered loss where the parties disagree as to the loss amount. Therefore, any claim for breach of contract for failure to pay would not accrue until after there was an appraisal award that [the insurer] refused to pay.").

The court also agrees with Garrison that Plaintiff's other claims against it, in Counts IV and V, also hinge on the foundational breach underlying Count I, *i.e.*, that Garrison is has failed to pay actual cash value as promised.  First, in Count IV, Plaintiff contends Garrison is liable for tort of bad faith.  However, under Alabama law, there can be no breach of an insurance contract, and therefore no bad faith,

49

until the insured proves he is legally entitled to recover. *Quick v. State Farm Mut. Auto. Ins. Co.*, 429 So. 2d 1033, 1035 (Ala. 1983). Therefore, Plaintiff's bad faith claim is also premature until an appraisal determines the actual cash value owed and triggers Garrison's obligation to pay. *Walker*, 2020 WL 1235626, at *7; *Enger*, 407 F. App'x at 193 ("Until an appraisal is completed, it is impossible to know whether [the insured's] claim in fact was undervalued, such that her claims for breach of contract [and] breach of the covenant of good faith and fair dealing … are viable.").

Plaintiff's other claim against Garrison, also jointly against CCC, is for civil conspiracy, based on an allegation that both "entered into an elicit agreement … to utilize CCC Valuations to provide improper total loss valuations" to Plaintiff and other Garrison insureds. Setting aside potentially serious, merits-based objections to that claim that Garrison has not seen fit to raise at this time, *see Walker*, 2020 WL 1235626, at *7-8, Plaintiff would have the burden to show as an element that he suffered damage as a proximate result of Defendants' ostensibly wrongful conduct. Ultimately, however, the injury upon which Plaintiff would rely would still just be that Garrison paid him less than actual cash value. But, as explained, until the appraisal determines that amount, Garrison does not legally owe it, so Plaintiff cannot yet show he has suffered damage. Plaintiff cannot avoid the operation of the appraisal clause through technical pleading or trying to re-cast the

dispute through the lens of alternative theories of recovery. *See Bettor*, 2019 WL 2245564, at *3. The court concludes that the operation and scope of the appraisal clause is broad enough to preclude all of Plaintiff's claims against Garrison pending completion of an appraisal.

That conclusion is not altered by the court's consideration of any of the numerous cases Plaintiff cites on the issue. Several of those in which an appraisal was denied are readily distinguishable because, unlike here, the claims involved disputes over coverage and the cause of damage, not just the amount of the loss. *See, e.g., Rogers*, 984 So. 2d at 392; *Baker v. Country Cas. Ins. Co.*, 2013 WL 12149181, at *2 (N.D. Ala. Apr. 16, 2013); *Caribbean I Owners' Ass'n, Inc. v. Great Am. Ins. Co. of NY*, 619 F. Supp. 2d 1178, 1188 (S.D. Ala. 2008).

Plaintiff also relies heavily upon *Lopez v. Progressive Select Ins. Co.*, 2019 WL 7371823, at *1 (S.D. Fla. Mar. 15, 2019), *report and recommendation adopted*, 2019 WL 4731644 (S.D. Fla. May 14, 2019). In that case, an insured brought a putative class action in state court, raising two claims. 2019 WL 4731644, at *1. In the first, the insured sought only declaratory relief, based on a challenge to the insurer's method of valuing total-loss vehicle claims, determinations actually made by the insurer's third-party contractor, like CCC here. *Id.* Specifically, the insured alleged that such methodology conflicted with Fla. Stat. § 626.9743, providing that insurers "shall" use one of several prescribed

"methods" to determine "actual cash value" on first-party, total-loss insurance claims. *Id.* In his other claim in the case, the *Lopez* insured sought damages for breach of the policy based on the insurer's practice of demanding title to an insured's total-loss vehicle upon settlement, selling the vehicle for salvage, and keeping the proceeds for itself. *Id.* The insurer removed the action and moved to compel an appraisal and dismiss, arguing that the insured's claims amounted to disputes over the amount of the loss. *Id.* The district court denied the motion to compel an appraisal, stating the case was "not merely a dispute about the *amount* paid to the insured" in that there existed "issues of statutory and contract interpretation to be handled by the Court." *Lopez*, 2019 WL 4731644, at *4 (emphasis original). Nevertheless, the *Lopez* court also remanded the "valuation method" claim for lack of subject-matter jurisdiction, holding that the insured had failed to allege facts showing that he or class members would likely suffer future injury as required for standing to pursue declaratory relief. *Id.*

While this court does not necessarily take issue with the disposition in *Lopez*, the court also does not find the decision to be "directly on point," contrary to Plaintiff's suggestion. (Doc. 39 at 11). For one thing, the *Lopez* court remanded the claim challenging the insurer's valuation methodology for lack of jurisdiction. Accordingly, any discussion of whether that claim fell within the scope of the policy's appraisal clause was dicta. Even so, the claim was also different than

Plaintiff's challenge to Defendants' valuation methodology.  Plaintiff certainly

decries those methods as statistically flawed and unreliable as a general matter and

that they lead systematically to Garrison's undervaluation of vehicles.  But unlike

in *Lopez*, Plaintiff points to no alleged conflict with a state statute or regulation

requiring the insurer's use of particular valuation methods, which might necessitate

their judicial construction.  Plaintiff likewise raises no claim here contesting

Garrison's sale of his vehicle for salvage.  That claim in *Lopez* raised a legal issue

over the respective parties' substantive rights under the policy in relation to the

disposition of the insured vehicle following settlement of the first-party claim.

The Second Circuit's recent decision in *Milligan*, *supra*, is also

distinguishable.  There an insured challenged the insurer's reliance upon CCC's

valuation methodology for determining what the insured was owed following the

total loss of her vehicle.  As that court of appeals explained, however, the insured

was "not simply claiming that the value of her loss was greater than [the insurer's]

calculation." 920 F.3d at 153.  Rather, while the policy generally required the

insurer to pay the "actual cash value" of a total-loss vehicle in first-party claims, as

here, the insured insisted that such provision did not apply to her.  Instead, she

claimed that, because hers was a "current model year vehicle," a New York

insurance regulation entitled her to be paid an amount based on the sale price of a

brand new identical vehicle, a standard inconsistent, she said, with CCC's standard

53

method utilized generally to determine actual cash value based on comparable used vehicles. *Id.* at 153-54.   In that sense, *Milligan* might be viewed as similar to *Lopez*, in that each involve a claim that an insurer's valuation method conflicted with a positive enactment alleged to delineate a mandated formulation for determining the amount owed to the insured for a total-loss claim.  Again, no such statute or regulation is at issue in this case.

Finally, Plaintiff relies on a pair of Illinois state cases, *Travis v. American Mfrs. Mut. Ins. Co.*, 782 N.E.2d 322 (Ill. Ct. App. 2002), and *Hanke v. American Int'l South Ins. Co.*, 782 N.E.2d 328 (Ill. Ct. App. 2002), decided two days apart by the same three-judge panel.  In each case, the court found that the plaintiff's allegation that the defendant had engaged in a wide-ranging fraudulent scheme to undervalue insured vehicles presented "much more than a disagreement between the parties concerning the actual cash value of plaintiff's [vehicle]." *Travis*, 782 N.E.2d at 327; *Hanke*, 782 N.E.2d at 332.  The court also highlighted, in finding that the disputes were not covered by the appraisal clause, the plaintiff's allegations to the effect that the defendants relied on the clause as part of that scheme.   However, Plaintiff has not asserted fraud claims in this case.  Nor has he argued or alleged facts supporting that he was fraudulently induced to enter into the insurance contract containing the appraisal clause.  It is fair to say that, as in *Travis* and *Hanke*, Plaintiff's claims in this action are not *only* about the value of

54

his vehicle.  But the fact remains that there is such a disagreement, and it underlies all of Plaintiff's claims.  As such, Garrison has the contractual right to demand an appraisal, and Plaintiff has a contractual obligation to proceed with the appraisal process.  *See Garner v. State Farm Mut. Auto. Ins. Co.*, 2008 WL 2620900, at *7 (N.D. Cal. June 30, 2008).  Finally, to the extent that *Travis* and *Hanke* stand for or suggest the proposition, the court does not agree that an insured might be able to avoid such a contractual obligation to comply with an appraisal demand by the simple expedient of pleading that an insurer is engaged in a wide reaching, "scheme to undervalue vehicles and that demanding appraisals is "part of" that "scheme."

Thus, the court will grant Garrison's motion to compel an appraisal and to stay these proceedings (doc. 20) as it relates to the claims against it pending the completion of the appraisal.

## IV.   Conclusion

Based on the foregoing, the court **ORDERS** as follows:  (1)  Garrison's motion to compel appraisal and to stay (Doc. 20) is **GRANTED** and (2) CCC's motion to compel appraisal and to stay or dismiss (Doc. 21) is **DENIED**.  Because the court previously granted CCC's motion to stay discovery pending the resolution of the appraisal between Garrison and Plaintiff (s*ee* doc. 23), the parties

are to meet and confer to provide the court with dates concerning discovery and

dispositive motions within ten days of competition of the appraisal.

      **DONE** and **ORDERED**, this 12th day of May, 2020.

_____

**JOHN E. OTT**
Chief United States Magistrate Judge